# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 21-371V
### Filed: April 23, 2025

|  |  |
|---|---|
| SOPHIE POORE, | Special Master Horner |
| Petitioner, | |
| v. | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |

*Glen Howard Sturtevant, Jr., Rawls Law Group, Richmond, VA, for petitioner.*
*Eleanor Hanson, U.S. Department of Justice, Washington, DC, for respondent.*

### FINDINGS OF FACT AND CONCLUSIONS OF LAW DISMISSING TABLE CLAIM[1]

On January 8, 2021, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa, *et seq.* (2012), alleging that following receipt of an influenza ("flu") vaccine on October 10, 2020, she suffered a Table Injury of a shoulder injury related to vaccine administration ("SIRVA") or, alternatively, a shoulder injury caused-in-fact by her vaccination.  (ECF No. 1.)  For the reasons set forth below, I conclude that petitioner has satisfied the threshold requirement of demonstrating an injury persisting for at least six months.  However, her Table claim is DISMISSED.  Nonetheless, she shall have the opportunity to seek an expert to support a cause-in-fact claim.

### I.    Applicable Statutory Scheme

Under the National Vaccine Injury Compensation Program, compensation awards are made to individuals who have suffered injuries after receiving vaccines.  In

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the document will be available to anyone with access to the internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

general, to gain an award, a petitioner must make a number of factual demonstrations, including showing that an individual received a vaccination covered by the statute; received it in the United States; has received no previous award or settlement on account of the injury; and has suffered a serious or long-standing injury.  In particular, in order to demonstrate a compensable injury under the Vaccine Act, a vaccinee must have either:

> (i) suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine, or (ii) died from the administration of the vaccine, or (iii) suffered such illness, disability, injury, or condition from the vaccine which resulted in inpatient hospitalization and surgical intervention.

§ 300aa-11(c)(1)(D) (referred to herein as the statutory "severity requirement").

The petitioner must also establish a *causal link* between the vaccination and the injury.  In some cases, the petitioner may simply demonstrate the occurrence of what has been called a "Table Injury."  That is, it may be shown that the vaccine recipient suffered an injury of the type enumerated in the "Vaccine Injury Table," corresponding to the vaccination in question, within an applicable time period following the vaccination also specified in the Table.  If so, the Table Injury is presumed to have been caused by the vaccination, and the petitioner is automatically entitled to compensation, unless it is affirmatively shown that the injury was caused by some factor other than the vaccination.  § 300aa-13(a)(1)(A); § 300aa-11(c)(1)(C)(i); § 300aa-14(a); § 300aa-13(a)(1)(B).

As relevant here, the Vaccine Injury Table lists SIRVA as a compensable injury if it occurs within ≤48 hours of administration of a flu vaccine.  § 300aa-14(a) as amended by 42 C.F.R. § 100.3.  Table Injury cases are guided by a statutory "Qualifications and aids in interpretation" ("QAI"), which provides more detailed explanation of what should be considered when determining whether a petitioner has actually suffered an injury listed on the Vaccine Injury Table. § 300aa-14(b).  To be considered a Table SIRVA petitioner must show that his/her injury fits within the following definition:

> SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm.  These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction.  SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.).  SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis . . . A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i)    No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii)   Pain occurs within the specified time-frame;

(iii)  Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv)   No other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, and any other neuropathy).

42 C.F.R. § 100.3(c)(10).

Alternatively, if no injury falling within the Table can be shown, a petitioner could still demonstrate entitlement to an award by instead showing that the vaccine recipient's injury or death was caused-in-fact by the vaccination in question. § 300aa-13(a)(1); § 300aa-11(c)(1)(C)(ii). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321-22 (Fed. Cir. 2010) (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). To successfully demonstrate causation-in-fact, petitioner bears a burden to show: (1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of proximate temporal relationship between vaccination and injury. *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005).

For both Table and Non–Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. § 300aa-13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2 (alterations in original) (citation omitted); *see also Snowbank Enters. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). A petitioner may not receive a Vaccine Program award based solely on her assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. § 300aa-13(a)(1).

Cases in the Vaccine Program are assigned to special masters who are responsible for "conducting all proceedings, including taking such evidence as may be appropriate, making the requisite findings of fact and conclusions of law, preparing a decision, and determining the amount of compensation, if any, to be awarded." Vaccine Rule 3(b)(1). Special masters must ensure each party has had a "full and fair opportunity" to develop the record. Vaccine Rule 3(b)(2). However, special masters are empowered to determine the format for taking evidence based on the circumstances of each case. Vaccine Rule 8(a); Vaccine Rule 8(d). Special masters are not bound by common law or statutory rules of evidence but must consider all relevant and reliable evidence in keeping with fundamental fairness to both parties. Vaccine Rule 8(b)(1). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." § 300aa-13(b)(1). The special master is required to consider all the relevant evidence of record, draw plausible inferences, and articulate a rational basis for the decision. *Winkler v. Sec'y of Health & Human Servs.*, 88 F.4th 958, 963 (Fed. Cir. 2023) (citing *Hines ex rel. Sevier v. Sec'y of Health & Human Servs.*, 940 F.2d 1518, 1528 (Fed. Cir. 1991)).

## II.    Procedural History

Between January and September of 2021, petitioner filed medical records marked as Exhibits 1-6 and affidavits marked as Exhibits 7-8. (ECF Nos. 7, 11, 13.) She filed a Statement of Completion on September 9, 2021. (ECF No. 15.) The case was then assigned to the Chief Special Master as part of the Special Processing Unit ("SPU"), a process intended to expedite cases that have a high likelihood of informal resolution based on the allegations in the petition. (ECF Nos. 18-19.) Petitioner subsequently filed additional medical records[2] and an amended Statement of Completion. (ECF Nos. 22-23.)

Respondent filed his Rule 4(c) Report on June 15, 2023. (ECF No. 29.) Respondent argued that petitioner's injury does not qualify as a Table SIRVA because her pain was not limited to her shoulder, noting that petitioner experienced symptoms radiating to her neck and down her arm to her fingers, including "inconsistent neurological symptoms." (*Id.* at 4-5.) Respondent also noted the lack of a medical opinion that would support a cause-in-fact injury. (*Id.* at 6.) Finally, respondent asserted that petitioner's injury did not satisfy the statutory severity requirement, arguing that the medical records were insufficient to demonstrate that petitioner's alleged shoulder injury lasted for more than six months post-vaccination. (*Id.* at 7.) Specifically, respondent stressed that the most recent medical record filed by petitioner at that point

---

[2] On July 25, 2022, petitioner filed orthopedic medical records as Exhibit 9. (ECF No. 22-1.) However, on June 30, 2023, petitioner filed family medicine records also marked as Exhibit 9. (ECF No. 32-1.) Accordingly, this decision will refer to these sets of records by their court assigned electronic docket number ("ECF No.") rather than as Exhibit 9.

was a physical therapy record dated February 25, 2021, which was around four-and-a half months post vaccination. (*Id.*) Following the filing of respondent's report, the case was reassigned to the undersigned. (ECF Nos. 30-31.)

Petitioner filed additional medical records which showed that she returned to care after a two-year gap in treatment. (ECF Nos. 32-34; Ex. 10.) I then held a Rule 5 status conference. (ECF No. 34.) I advised that parties that in my preliminary view, petitioner's medical records included enough concern regarding a potential cervical radiculopathy, that petitioner would likely need to proceed based on causation-in-fact. (*Id.* at 2.) I also addressed respondent's concern regarding the two-year gap in treatment and the severity requirement. (*Id.* at 3.) I encouraged petitioner to seek to develop the record further with respect to her condition during her gap in treatment; however, I also advised that given the details of her presentation, petitioner may need an expert opinion to demonstrate that her symptoms before and after her gap in treatment represented the same injury. (*Id.*)

In response to my Rule 5 Order, petitioner filed a status report indicating that she "does not have any additional evidence to submit." (ECF No. 35.) I then directed the parties to file a joint status report indicating how they propose to proceed. (Non-PDF Scheduling Order, filed Oct. 11, 2023.) Petitioner then filed a joint status report on behalf of the parties proposing that the case proceed to a ruling on the written record. (ECF No. 36.) Petitioner's counsel then sought confirmation as to whether the parties would be briefing the severity requirement as a threshold issue or entitlement comprehensively. (*See* ECF No. 39.) I advised the parties to brief entitlement comprehensively. (*Id.*) Petitioner filed a motion for a ruling on the written record and accompanying memorandum on February 16, 2024. (ECF Nos. 41-42.) Petitioner's motion was accompanied by additional materials (a disability benefits claim, medical literature, and a questionnaire presented to one of petitioner's treating physicians) marked as Exhibits 11-16. (ECF No. 42.) Respondent filed his response in May of 2024. (ECF No. 47.) Although petitioner filed updated medical records after filing her motion, she did not file any reply. (ECF Nos. 43, 45; Exs. 17-18.)

In light of the above, I have determined that the parties have had a full and fair opportunity to present their cases, and that it is appropriate to resolve the questions of both the statutory severity requirement and petitioner's Table claim based on the existing record. However, for the reasons discussed below, I conclude based on review of the parties' briefing that this case is not yet ripe for resolution of petitioner's alternative causation-in-fact claim. *See* Vaccine Rule 8(d); Vaccine Rule 3(b)(2); *see also Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (noting that "special masters must determine that the record is comprehensive and fully developed before ruling on the record").

### III.    Factual History

On October 10, 2020, petitioner received the flu vaccination at issue in her right deltoid. (Ex. 1, p. 2.) She had a prior history of bilateral carpal tunnel release and De

Quervain's tenosynovitis.[3]  (Ex. 5, pp. 82, 100.)  In her written statement, petitioner indicates that "[m]y arm was sore following the vaccine and as time when on, my right shoulder hurt more and more."  (Ex. 7, p. 1.)  Although petitioner indicates she was able to continue working (as a school custodian) during this period, the pain began to interfere with her sleep.  (*Id.*)

On November 3, 2020, petitioner presented to an Immediate Care Clinic where she was seen by Nurse Practitioner ("NP") Daniels.  (Ex. 3, p. 14.)  She complained of "having pain and weakness in her right arm after getting the flu shot on 10/10/20.  Her pain radiates down the right arm and up into the right side of neck."  (*Id.*)  On musculoskeletal exam, her right shoulder was noted to exhibit tenderness, trapezius[4] pain, and spasms.  (*Id.*)  However, she had normal range of motion.  (*Id.*)  Petitioner was diagnosed with a trapezius muscle spasm, for which she was prescribed cyclobenzaprine,[5] methylprednisolone,[6] and ketorolac.[7]  (*Id.* at 15.)

Petitioner returned to NP Daniels for a follow up two weeks later.  (Ex. 3, p. 27.)  Petitioner reported the same symptoms of right shoulder pain radiating to the neck and indicated the severity of her pain fluctuated and that her symptoms were aggravated by movement.  (*Id.*)  She denied numbness or tingling.  (*Id.*)  She noted she had tried heat and ice as well as the prescribed muscle relaxant.  (*Id.*)  Upon musculoskeletal exam, petitioner was now "[u]nable to actively lift arm above shoulder level.  Unable to tolerate

[3] De Quervain's tenosynovitis is an overuse injury with painful inflammation of the tendon sheath due to the narrowness of the common tendon sheath of the abductor pollicis longus and extensor pollicis brevis, muscles of the thumb.  *De Quervain disease*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=70255 (last visited Apr. 11, 2025); *Tenosynovitis*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=49214 (last visited Apr. 11, 2025); *Musculus Abductor Pollicis Longus*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=90616 (last visited Apr. 11, 2025); *Musculus Extensor Pollicis Brevis*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=90699 (last visited Apr. 11, 2025).

[4] Trapezius is a muscle extending over the neck and back that runs from the occipital bone through all the thoracic vertebrae, extends laterally to the scapula, and attaches to the clavicle, which plays an important role in elevating the shoulder, rotating the scapula to raise the shoulder with abduction of the arm, and drawing the scapula backwards.  *Musculus Trapezius*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=91003 (last visited Apr. 11, 2025).

[5] Cyclobenzaprine is a drug compound administered orally that is "used as a skeletal muscle relaxant for relief of painful muscle spasms." *Cyclobenzaprine Hydrochloride*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=12135 (last visited Apr. 11, 2025).

[6] Methylprednisolone is a synthetic glucocorticoid derived from progesterone that is used as an anti-inflammatory, among other uses, in a wide variety of disorders and is administered orally.  *Methylprednisolone*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=31014 (last visited Apr. 11, 2025).

[7] Ketorolac is a nonsteroidal anti-inflammatory drug that is administered orally, intramuscularly, or intravenously "for short-term management of pain."  *Ketorolac Tromethamine*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=26960 (last visited Apr. 11, 2025).

passive ROM." (*Id.* at 28.)  Petitioner was diagnosed with adhesive capsulitis in addition to her previously diagnosed trapezius muscle spasms and she was referred to an orthopedic specialist.  (*Id.*)

On December 17, 2020, petitioner presented to an orthopedic surgeon, Thomas Leong, M.D.  (ECF No. 22-1, p. 10.)  Petitioner provided the following history:

> Her shoulder pain began on 10/10/2020 after she had a flu shot.  She had typical arm soreness after her flu shot that continued to worsen over the following week.  She says her shoulder pain is now constant.  She feels like her pain radiates all the way from her neck into her fingers.  She has pain with overhead movements.  She has pain at night and cannot lay on the right shoulder.  She notices weakness and stiffness in her hand and fingers occasionally.  She denies any numbness or tingling of the right upper extremity.  She has tried heat, Toradol, Medrol Dosepak, and muscle relaxer which gives her some relief.  She also says she had a steroid injection in the shoulder by her PCP which gave her minimal relief.[8]

(*Id.*)

On physical exam of her shoulder, petitioner had active forward flexion to 130 degrees, abduction to 90 degrees, and external rotation to 75 degrees.  (ECF No. 22-1, p. 12.)  She also had pain with primary and secondary impingement maneuvers as well as cross body abduction and mild weakness on empty can testing.  (*Id.*)  However, several other specialized tests were negative, including drop arm, Speed's, Yergason's, and O'Brien's test.  (*Id.*)  Examination of the cervical spine found full active range of motion of the neck in all planes and negative Spurling's test bilaterally.  (*Id.* at 12-13.)  X-rays of the shoulder showed a type II plus acromion, but no acute process.  (*Id.* at 13.)  Petitioner was diagnosed with impingement syndrome of the right shoulder and cervical radiculopathy.  (*Id.*)  Dr. Leong explained that "[i]t is unclear whether her primary pain generator is her shoulder or neck today."  (*Id.*)  He recommended petitioner pursue physical therapy for both her neck and her shoulder to see if her shoulder symptoms persisted and then follow up in six weeks.  (*Id.*)

Petitioner presented for an initial physical therapy evaluation on February 10, 2021.  (Ex. 6, p. 5.)  It was noted that petitioner "[h]as had some neurological symptoms but not consistently."  (*Id.*)  Following the initial evaluation, the physical therapist felt petitioner's "[s]igns and symptoms [are] consistent with right shoulder impingement syndrome secondary to muscular imbalance with concurrent cervical muscle strain and right lateral epicondyle irritation."  (*Id.* at 8.)  The physical therapist recommended that petitioner start one session of physical therapy per week for 12 weeks. (*Id.* at 9.)  However, petitioner never returned and was discharged on February 25, 2021.  (*Id.* at 12.)

---

8  Rather than an injection into the shoulder, NP Daniels's records indicate petitioner was administered a 40mg dose of methylprednisolone acetate intramuscularly in her left upper hip. (Ex. 3, p. 33.)

Petitioner also presented to her primary care provider with unrelated complaints during this period.  (Ex. 2.)  After her physical therapy discharge, there is a greater than two-year gap in petitioner's treatment records.  Petitioner submitted a written statement dated August 31, 2021, indicating that "I was not able to attend physical therapy because of COVID-19.  I did not feel safe attending therapy in a public facility.  I continued to do home exercises for my shoulder."  (Ex. 7, p. 2.)  The record of petitioner's physical therapy evaluation does confirm she was given a home exercise plan.  (Ex. 6, p. 9.)  She also noted that "I cannot afford to keep going to the doctor." (Ex. 7, p. 3.)

On May 16, 2023, petitioner presented to her primary care provider, seeing Matthew Hardy, D.O., at that encounter.  (ECF No. 32-1, p. 7.)  She reported two concerns: (1) a one-week cough with congestion and fever and (2) persistent right arm soreness since her flu vaccination in October of 2020.  (*Id.*)  With regard to her arm pain, Dr. Hardy noted that it "is worsened by movement and lifting against resistance but will happen on its own.  Subjective R arm weakness.  Endorses paresthesias to R arm over past several months.  Pain is associated with neck pain."  (*Id.*)  On exam, petitioner had significant tenderness along the supraspinatus.[9]  (*Id.* at 8.)  She was able to tolerate full passive range of motion but had pain with abduction beyond 45 degrees as well as pain with internal, but not external, rotation.  (*Id.*)  She had a positive Hawkins test and strength of 4/5.  (*Id.*)  Dr. Hardy was unsure of the etiology for petitioner's shoulder pain and recommended an MRI, which she underwent on June 14, 2023.  (*Id.* at 9; Ex. 10, p. 10.)  The MRI showed (1) a complete tear of the right rotator cuff, "unspecified whether traumatic," (2) biceps tendinosis, and (3) arthrosis of the acromioclavicular joint.  (Ex. 10, p. 10.)

Petitioner returned to the same office on June 19, 2023, and saw a different physician, David Hudson, M.D.  (ECF No. 32-1, p. 11.)  She reported to Dr. Hudson that her right shoulder pain "has been progressively worsening."  (*Id.* at 12.)  Dr. Hudson reviewed petitioner's MRI and noted a full thickness tear of the supraspinatus with tendinosis.  (*Id.* at 13.)  Petitioner was instructed to follow up with an orthopedist.  (*Id.*) Petitioner then returned to Dr. Leong on July 3, 2023.  (Ex. 10, p. 6.)  Dr. Leong remarked with regard to the finding of a rotator cuff tear that petitioner "has had several years of pain and has failed conservative management."  (*Id.* at 10.)  However, petitioner provided a history indicating that since she had last seen Dr. Leong in 2020, "her pain comes and goes."  (*Id.* at 6.)  Additionally, whereas petitioner's prior pain had been around her trapezius, she now reported pain "located anterior lateral to the acromion in the subdeltoid distribution," though she did also have some radiation of pain

---

[9] Supraspinatus is a muscle along the backside of the shoulder that originates from the supraspinous fossa of the scapula and inserts at the greater tubercle of the humerus and that plays an important role in abducting the humerus.  *Musculus Supraspinatus*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=90974 (last visited Apr. 18, 2025).  The supraspinatus is one of the four muscles that comprises the rotator cuff, which provides mobility and strength to the shoulder joint.  *Rotator cuff*, DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=67782 (last visited Apr. 18, 2025).

into her lateral neck.  (*Id.*)  Dr. Leong recommended a surgical repair of the rotator cuff, though cervical radiculopathy also remained listed under active problems.  (*Id.* at 7, 10.)

Petitioner underwent arthroscopic shoulder surgery on December 19, 2023.  (Ex. 18, p. 16.)  The following procedures were completed: glenohumeral debridement, anterior and posterior labrum, biceps tendon, and rotator cuff; subacromial decompression, rotator cuff repair; distal clavicle excision; and open biceps tenodesis.  (*Id.*)  Her post-operative diagnoses were subacromial impingement, acromioclavicular joint impingement, biceps tendon tear and rotator cuff tear, and degenerative fraying, anterior and posterior labrum.  (*Id.*)  As of the most recent medical record of February 1, 2024, petitioner was doing well post-operatively and reported that her pain was improving.  (Ex. 17, p. 2.)

Accompanying her motion, petitioner filed a disability claim form signed by Dr. Leong on December 29, 2023, which indicates she had a surgical rotator cuff repair performed on December 19, 2023.  (Ex. 11.)  That form relates petitioner's rotator cuff tear back to December 17, 2020.  (*Id.*)  Also accompanying petitioner's motion, however, is a contradictory "Questionnaire for Petitioner's Treating Doctor."  (Ex. 16, p. 1.)  The questionnaire indicates it was directed to Dr. Leong; however, it is unsigned.[10] (*Id.*)  It poses two questions.  First: "In your opinion, given your assessment of [petitioner] on December 17, 2020, is it more likely than not that she continued to experience shoulder pain and limited range of motion beyond April 10, 2021?"  Following this prompt, there is a handwritten "yes."  (*Id.*)  Second: "In your opinion, given your assessment of [petitioner] on July 3, 2023, is it more likely than not that her continued shoulder pain is from the same injury she suffered from on December 17, 2020?"  Following this prompt, there is a handwritten "No."  (*Id.*)

## IV.    Analysis

### a.  Severity Requirement

As explained above, the Vaccine Act requires in pertinent part that a petitioner demonstrate that "the residual effects or complications" of her alleged injury have persisted for more than six months following vaccination.  § 300aa-11(c)(1)(D).  Neither "residual effects" nor "complication" is defined within the Vaccine Act itself.  *See* § 300aa-33.  However, in *Wright v. Secretary of Health & Human Services*, the Federal Circuit described these terms as follows: "'Residual' suggests something remaining or left behind from a vaccine injury.  An effect that is 'residual' or 'left behind' is one that never goes away or that recurs after the original illness."  22 F.4th 999, 1005 (Fed. Cir. 2022) (internal citation omitted).  A "complication," however, is "[a] morbid process or event occurring during a disease which is not an essential part of the disease, although it may result from it."  *Id.* at 1006 (alteration in original) (citation omitted).

---

[10] Especially given the lack of any signature, the authenticity of the questionnaire responses is not self-evident.  However, in his motion response, respondent not only does not challenge the authenticity of the responses, but he also argues they support his position. (ECF No. 47, p. 7.)

Read together, "residual effects" and "complications" appear to both refer to conditions within the patient, with "residual effects" focused on lingering signs, symptoms, or sequalae characteristic of the course of the original vaccine injury, and "complications" encompassing conditions that may not be "essential part[s] of the disease" or may be outside the ordinary progression of the vaccine injury.

*Id.* (alteration in original).

Because the complication or residual effect must be "of such illness, disability, injury, or condition," the traditional tort concepts of causation apply, and the vaccine injury must be both a but-for cause and a substantial contributing factor to the complication or residual effects at issue. *Wright*, 22 F.4th at 1004-05. The Vaccine Act prohibits a special master from ruling for petitioner based solely on her allegations unsubstantiated by medical records or medical opinion. § 300aa-13(a)(1). However, "the function of a special master is not to 'diagnose' vaccine-related injuries, but instead to determine 'based on the record evidence as a whole and the totality of the case,'" whether causation has been demonstrated. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1382 (Fed. Cir. 2009) (quoting *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 549 (Fed. Cir. 1994)). Special masters are not bound by the reports, summaries, or conclusions contained in the medical records. § 300aa-13(b)(1). Rather, the special master must consider the entire record. *Id.*

A petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim. *See* § 300aa-13(a)(1)(A). However, not every element of petitioner's claim needs to be specifically supported by medical records or opinion. For example, onset of an injury may be determined to be consistent with the Vaccine Injury Table even when the first symptom or manifestation "was not recorded or was incorrectly recorded as having occurred outside such period." § 300aa-13(b)(2). The fact of a vaccination also need not itself be proven by medical records or medical opinion. *See, e.g.*, *Wonish v. Sec'y of Health & Human Servs.*, No. 90-667V, 1991 WL 83959, at *4 (Cl. Ct. Spec. Mstr. May 6, 1991) (stating, with regard to § 300aa-13(a)(1), that "[i]t seems obvious then that not all elements must be established by medical evidence" and that "[v]accination is an event that in ordinary litigation could be established by lay testimony" as "[m]edical expertise is not typically required"); *Centmehaiey v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 612, 621 (1995) (noting that "[t]he lack of contemporaneous, documentary proof of vaccination, however, does not necessarily bar recovery"), *aff'd*, 73 F.3d 381 (Fed. Cir. 1995). The Federal Circuit has also observed, albeit in the context of attorneys' fees and costs, that "[w]hile lay opinions as to causation or medical diagnosis may be properly characterized as mere 'subjective belief' when the witness is not competent to testify on those subjects, the same is not true for sworn testimony as to facts within the witness's personal knowledge, such as the receipt of a vaccine and the timing and severity of symptoms." *James-Cornelius v. Sec'y of Health & Human Servs.*, 984 F.3d 1374, 1380 (Fed. Cir. 2021).

However, medical records do ordinarily "warrant consideration as trustworthy evidence." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993). Thus, where subsequent testimony conflicts with contemporaneous medical records, special masters frequently accord more weight to the medical records. *See, e.g.*, *Reusser v. Sec'y of Health & Human Servs*., 28 Fed. Cl. 516, 523 (1993) ("[W]ritten documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later."); *see also Vergara v. Sec'y of Health & Human Servs*., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recounted in later medical histories, affidavits, or trial testimony.").

Special masters are cautioned against favoring contemporaneous records "reflexively" and must not overemphasize individual records at the expense of a comprehensive evaluation of the entire record. *Shapiro v. Sec'y of Health & Human Servs*., 101 Fed. Cl. 532, 539-41 (2011). "[M]edical records are only as accurate as the person providing the information." *Parcells v. Sec'y of Health & Human Servs*., No. 03-1192V, 2006 WL 2252749, at *2 (Fed. Cl. Spec. Mstr. July 18, 2006). Moreover, "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance." *Murphy v. Sec'y of Health & Human Servs*., 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. denied*, *Murphy v. Sullivan*, 506 U.S. 974 (1992).

There are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs*., 69 Fed. Cl. 775, 779 (2006) (explaining that, "like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie v. Sec'y of Health & Human Servs*., No. 03-1585V, 2005 WL 6117475, at *19 (Fed. Cl. Spec. Mstr. Dec. 12, 2005) ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." (quoting *Murphy*, 23 Cl. Ct. at 733)). However, when witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent and compelling." *Camery v. Sec'y of Health & Human Servs*., 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Human Servs*., No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In *Kirby v. Secretary of Health & Human Services*, the Federal Circuit confirmed that it is not an error for a special master to find the severity requirement met where that finding is based on a collection of "plausible evidence." 997 F.3d 1378, 1381 (Fed. Cir. 2021). In that case, petitioner's medical records reflected active treatment of her condition for only a few months before she was released as having reached maximum medical improvement, though not entirely symptom free. *Id.* at 1379-80. Thereafter, the medical records were silent as to her alleged residual effects for the remaining duration of the six-month post-vaccination period. *Id.* at 1380. However, petitioner

testified that she continued a home exercise plan for more than a year. *Id.* at 1381. Her testimony was corroborated by documentation in the form of her retained home exercise instruction sheets, a more remote return visit where the relevant symptoms were again reported, and an expert opinion confirming her reported symptoms were consistent with her injury. *Id.* The Federal Circuit concluded that where the medical records are silent, rather than contradictory, it was not error for the special master to credit the petitioner's corroborated testimony as evidence satisfying the six-month severity requirement. *Id.* at 1383-84.

In this case, petitioner's medical records show that when she first presented for care for her alleged SIRVA, she was experiencing neck, shoulder, and arm pain initially diagnosed as a trapezius muscle spasm based on her clinical presentation. (Ex. 3, pp. 14-15.) When she subsequently sought specialist care from an orthopedist, he opined he could not determine whether the etiology of her symptoms related to her shoulder or her neck. (ECF No. 22-1, p. 13.) Petitioner discontinued treatment for this condition after only four months, without completing the recommended physical therapy and without completing any more definitive diagnostics, such as an MRI. (*See* Ex. 6, p. 12.) Although petitioner returned to care after more than two years complaining of "persistent" symptoms ever since the time of her vaccination (ECF No. 32-1, p. 7), she also specifically reported that throughout this period, her pain "comes and goes." (Ex. 10, p. 6.) Moreover, whereas her initial complaint in 2020 focused on pain and tenderness at the trapezius (Ex. 3, pp. 14-15), Dr. Hardy's May 2023 exam upon her return to care confirmed pain and tenderness at the supraspinatus, which had not been recorded earlier and which ultimately correlated to a complete rotator cuff tear confirmed by MRI. (ECF No. 32-1, pp. 7-8; Ex. 10, p. 10). Although petitioner argues that a rotator cuff tear is a possible complication of shoulder impingement as initially diagnosed by Dr. Leong (ECF No. 42, p. 15), petitioner has presented conflicting evidence indicating that Dr. Leong does not agree that petitioner's 2023 presentation represents a continuation of her 2020 condition. (Exs. 11, 16.) Specifically, although Dr. Leong has otherwise documented petitioner as having reported a continuous history of complaints since 2020, he explicitly denied holding an opinion that petitioner's presentation on July 3, 2023, represented a continuation of her injury from December 17, 2020. (Ex. 16, p. 1.) Accordingly, there is not preponderant evidence on the current record that petitioner's condition in 2023 evidenced ongoing complications or residual effects of her alleged post-vaccination injury in late 2020.

However, petitioner need not necessarily rely on her later 2023 medical records to demonstrate the persistence of her injury if she can otherwise demonstrate that the record evidence, on balance, supports a finding that her initial symptoms persisted until at least April of 2021. I find that petitioner has so demonstrated, albeit just barely. Petitioner last sought treatment of her injury at her physical therapy evaluation of February 10, 2021, two months short of the six-month mark. (Ex. 6, p. 5.) However, in her statement, petitioner indicates that she continued to experience symptoms and maintained a home exercise plan despite discontinuing formal physical therapy. (Ex. 7, p. 1.) This is similar to the *Kirby* petitioner insofar as nothing in the medical records directly contradicts this assertion and petitioner's medical records do at least confirm the

existence of her home exercise plan. (Ex. 6, p. 9); *Kirby*, 997 F.3d at 1380-81. This is dissimilar from *Kirby* in that petitioner's subsequent medical records are not persuasive as evidence of any ongoing injury and petitioner had not been released from formal care. 997 F.3d at 1380-81.

Here, I place some weight on the specific reasons petitioner has provided to explain her discontinuance of care - concern with respect to attending in-person physical therapy due to Covid-19 and financial constraints. (Ex. 7.) *See, e.g.*, *Tackett v. Sec'y of Health & Human Servs.*, No. 20-1705V, 2023 WL 6995391, at *9 (Fed. Cl. Spec. Mstr. Sept. 25, 2023) (accepting the Covid-19 pandemic as an explanation for discontinuance of physical therapy as documented by the physical therapist); *Owens v. Sec'y of Health & Human Servs.*, No. 18-0449V, 2019 WL 7187338, at *3-4 (Fed. Cl. Spec. Mstr. Oct. 31, 2019) (accepting circumstantial evidence that petitioner was still symptomatic despite discontinuing care due to a "busy work and family life"). However, because the medical records show that petitioner had already established a months-long course of treatment despite these specific concerns, I would not find that petitioner's statement alone is sufficient to preponderantly evidence ongoing sequela. Indeed, *Kirby*, *Tackett*, and *Owens*, all suggest that petitioner's say-so alone does not preponderantly support the presence of ongoing symptoms. In this case, as of February 10, 2021, petitioner's physical therapist recommended 12 additional weeks of physical therapy. (Ex. 6, p. 5.) Additionally, petitioner has submitted a questionnaire to Dr. Leong wherein he opines based on his December 2020 evaluation that petitioner's symptoms likely would have persisted until at least April of 2021. (Ex. 16.) Thus, even without accepting that her 2023 presentation was a continuation of her 2020 presentation, there is preponderant evidence that her symptoms likely persisted through at least April 10, 2021.

### b. Table Injury of SIRVA

As discussed above, petitioner is entitled to a presumption of causation if she can establish that her injury arose within 48-hours of vaccination and meets the specific criteria that define what constitutes a Table "SIRVA." 42 C.F.R. § 100.3(c)(10). Under the Vaccine Act, a petitioner bears the burden of demonstrating the factual underpinnings of her claim by a preponderance of the evidence. § 300aa-13(1)(a). Thus, she must demonstrate each of the four SIRVA QAI criteria by preponderant evidence. In this case, I find that petitioner cannot meet the third and fourth SIRVA QAI criterion and this is therefore dispositive of her Table claim.

The third SIRVA criterion requires that the petitioner's "[p]ain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii). Radiating pain does not *per se* prevent petitioner from demonstrating a Table SIRVA where the petitioner's condition is otherwise diagnosed and treated solely as a shoulder condition. *E.g. Werning v. Sec'y of Health & Human Servs.*, No. 18-0267V, 2020 WL 5051154, at *10 (Fed. Cl. Spec. Mstr. July 27, 2020). Instead, "the gravamen of this requirement is to guard against compensating claims involving patterns of pain or reduced range of motion indicative of

a contributing etiology beyond the confines of a musculoskeletal injury to the affected shoulder." *Grossmann v. Sec'y of Health & Human Servs*., No. 18-00013V, 2022 WL 779666, at *15 (Fed. Cl. Spec. Mstr. Feb. 15, 2022).

Relatedly, the fourth SIRVA criterion requires that "[n]o other condition or abnormality is present that would explain the patient's symptoms (e.g. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy)." 42 C.F.R. § 100.3(c)(10). This element of petitioner's showing "requires consideration of a petitioner's medical condition as a whole." *Record v. Sec'y of Health & Human Servs*., No. 21-1312V, 2025 WL 868957, at *6 (Fed. Cl. Feb. 26, 2025). However, while the "other condition or abnormality" at issue must qualify as an explanation for the petitioner's symptoms, it "need not be a better or more likely explanation." *French v. Sec'y of Health & Human Servs*., No. 20-0862V, 2023 WL 7128178, at *6 (Fed. Cl. Spec. Mstr. Sept. 27, 2023). Indeed, a petitioner may fail to meet the fourth SIRVA criterion even where there is clinical evidence of an alternative condition that falls short of a definitive diagnosis. *Durham v. Sec'y of Health and Human Servs*., No. 17-1899V, 2023 WL 3196229, at *14 (Fed. Cl. Spec. Mstr. May 2, 2023) (noting that the regulation cites "clinical evidence of" various conditions).

In this case, when petitioner first presented for care of her alleged SIRVA, she complained of shoulder pain, which the physical exam placed at the trapezius, and that radiated to her neck and down her arm. (Ex. 3, p. 14.) When she presented to the orthopedist, she further confirmed that her symptoms extended down to her hands and fingers. (ECF No. 22-1, p. 10.) The orthopedist concluded that he could not determine whether the etiology of her symptoms was related to her shoulder or her neck. (*Id.* at 13.) Her physical therapist likewise recorded the presence of neurologic symptoms and assessed cervical muscle strain concurrent to shoulder impingement. (Ex. 6, p. 5.) Even after the orthopedist separately diagnosed petitioner's rotator cuff tear years later, he never removed cervical radiculopathy from petitioner's active problems list. (Ex. 17, p. 3.) Thus, the evidence does not preponderate in favor of a finding that petitioner's pain was limited to her shoulder or that she is free of clinical evidence of cervical radiculopathy that could otherwise explain her symptoms.

Petitioner argues that her complaints of radiating pain should be viewed as emanating from her shoulder injury rather than being an independent injury. (ECF No. 42, p. 5 (citing *Callejas v. Sec'y of Health & Human Servs*., No. 20-1767V, 2023 U.S. Claims LEXIS 1225, at *5 (Fed. Cl. Spec. Mstr. May 5, 2023).) And, although she acknowledges her early medical records included potential assessments cervical radiculopathy as well as impingement syndrome and adhesive capsulitis, she argues that she need only preponderantly demonstrate that her condition is due to a shoulder rather than cervical condition, stressing that she "is not required to show that there is 100% agreement in all records by all providers that her injury is specifically to her shoulder." (*Id.* at 6.) However, these arguments are not persuasive on this record.

Petitioner overstates the degree to which her treatment records from 2020 confirm a shoulder etiology and understates the stated suspicion of a cervical etiology.

First, petitioner's medical records are not concordant with respect to what, if any, shoulder pathology she actually had. NP Daniels' first diagnosed a trapezius muscle spasm and then, when petitioner subsequently developed reduced range of motion, diagnosed adhesive capsulitis. (Ex. 3, pp. 14-15, 27-28.) Yet, petitioner's orthopedist, Dr. Leong, diagnosed impingement syndrome but not adhesive capsulitis. (ECF No. 22-1, p. 13.) Moreover, although petitioner is correct that a petitioner need not have unanimity among her providers, she is incorrect to suggest that her own providers are on equal footing. NP Daniels' is not a specialist, and her adhesive capsulitis diagnosis was based on a physical exam that was not recorded in any detail. (Ex. 3, p. 28.) Indeed, NP Daniels would have referred petitioner to a specialist, ultimately Dr. Leong, precisely for a more sophisticated assessment. (*Id.*) That assessment resulted in Dr. Leong's conclusion that it was not possible based on petitioner's clinical presentation at that time to determine whether her shoulder or her neck was generating her pain. (ECF No. 22-1, p. 13.)

Of course, petitioner discontinued treatment before any more definitive diagnostic testing was performed and the etiology of her condition was never confirmed. However, the SIRVA QAI indicates that mere "clinical evidence of" cervical radiculopathy, rather than a definite diagnosis, is incompatible with a Table SIRVA. *Durham*, 2023 WL 3196229, at *14. And, importantly,

> the purpose of the SIRVA criteria, and the QAI overall, is not to identify every case that may conceivably be vaccine-caused, but to identify cases that are sufficiently uncontroversial as to warrant a presumption of vaccine causation. Just because petitioner had shoulder pain following vaccination does not mean that her shoulder pain warrants a presumption of vaccine causation given her overall clinical presentation.

*Id.* at 13. Here, although etiology of petitioner's pain complaints was unresolved, this ambiguity does not help petitioner because she bears the burden of proof in demonstrating that her condition fits within the specific requirements of the QAI.

### c. Shoulder Injury Caused-in-Fact by Vaccination

As explained above, a cause-in-fact claim requires that, in addition to showing appropriate timing, petitioner must also demonstrate by preponderant evidence both a medical theory of causation and a logical sequence of cause and effect. *Althen*, 418 F.3d at 1278. Such a showing must be supported by the medical opinion of a competent physician, whether within the petitioner's medical records or in an expert report. § 300aa-13(a)(1). Here, although I instructed the parties to brief entitlement comprehensively, and no objection was interposed to resolving entitlement on the existing record, I nonetheless find that the parties' motion papers reveal confusion as to whether petitioner needed an expert report. This confusion may have been compounded by the prior Rule 5 order's focus on the severity requirement as a likely threshold issue in the case. (*See* ECF No. 34, p. 3.)

15

Petitioner argues that, even if she does not meet the specific requirements of the Table, two of her diagnoses – adhesive capsulitis and impingement syndrome – represent shoulder conditions consistent with SIRVA.  (ECF No. 42, pp. 6, 14-15.)  Further, petitioner argues, based on Dr. Leong's subsequent treatment, that petitioner's later rotator cuff tear diagnosis and treatment demonstrate that, even though her initial presentation was clouded by evidence of radiculopathy, it was still more likely to have represented a shoulder injury.  (*Id.* at 10-11.)  In that regard, although Dr. Leong explicitly disagreed that petitioner's 2020 and 2023 presentations reflected the same injury (Ex. 16), petitioner otherwise filed medical literature indicating that rotator cuff tears can be sequela of impingement syndrome.  (*Id.* at 15 (citing Ex. 15, p. 6).)  Petitioner argues that, because SIRVA "is not one specific disease," and because it may encompass impingement syndrome, she can therefore satisfy *Althen* prong one and two without presentation of an expert report.  (*Id.* at 13-14.)

In response, respondent raises two confounding issues.  First, respondent argues that petitioner cannot simply apply the SIRVA concept to a cause-in-fact claim.  (ECF No. 47, pp. 10-11.)  Rather, petitioner must demonstrate a medically recognized injury by preponderant evidence.  (*Id.* at 10 (citing *Broekelschen v. Sec'y of Health & Human Servs.*, 618 F.3d 1339, 1346 (Fed. Cir. 2010); *Lombardi v. Sec'y of Health & Human Servs.*, 656 F.3d 1343, 1352 (Fed. Cir. 2011).  Second, the medical articles petitioner has filed with respect to diagnosis carry only "minimal" weight without an expert opinion. (*Id.* at 10-11.)  Respondent is correct on both points.

Regarding the first point, while petitioner is correct that the concept of SIRVA potentially encompasses some of the shoulder conditions *possibly* at issue in this case, that does not obviate petitioner's burden of proof under *Althen*.  *E.g. Kelly v. Sec'y of Health & Human Servs.*, No. 17-1918V, 2022 WL 1144997, at *21 (Fed. Cl. Spec. Mstr. Mar. 24, 2022) ("The government's recognition of 'SIRVA' as a vaccine-caused injury was limited by the accompanying QAI criteria. In this case, I have already concluded for the reasons discussed above that petitioner has not met those criteria. Thus, if petitioner's medical theory under *Althen* prong one was limited to taking judicial notice of the government's recognition of SIRVAs as occurring in some contexts, petitioner's case would necessarily have to fail under *Althen* prong two, because the facts of petitioner's case do not fall within the confines of that recognition."); *see also Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992) (noting that "[s]imple similarity to conditions or time periods listed in the Table is not sufficient evidence of causation").  Even if the medical literature underlying respondent's rulemaking could be part of petitioner's formulation of a theory of causation, there is no medical opinion stated within the medical records indicating that petitioner's injury was vaccine caused or explaining by what theory vaccine causation could be ascribed.  *See Morris v. Sec'y of Health & Human Servs.*, No. 19-1570V, 2023 WL 5092691, at *6 (Fed. Cl. Spec. Mstr. July 11, 2023) (noting, with respect to petitioner's satisfaction of *Althen* prong one, that petitioner offered medical expert opinions supported by references to relevant medical literature, albeit including citations to two key pieces of literature that informed respondent's regulatory rulemaking regarding SIRVA).

Regarding the second point, the literature petitioner has filed is inadequate to resolve the medical issues presented in this case. First, petitioner seeks to minimize the degree to which impingement syndrome and adhesive capsulitis could be competing diagnoses by simply noting them to have "similarities." (ECF No. 42, p. 6.) However, while the two articles petitioner has filed do discuss some similar symptoms, the articles clearly reflect that the conditions are not interchangeable. (Exs. 12, 15.) Moreover, nothing in this literature discusses either condition as being vaccine caused. Indeed, these articles discuss impingement syndrome as having multiple different potential causes and adhesive capsulitis as having an uncertain pathophysiology. (Ex. 12, p. 2; Ex. 15, pp. 1-2.) Thus, even taking account of these articles, a medical opinion would remain necessary to substantiate petitioner's argument vis-à-vis causation-in-fact. Second, while petitioner argues based on this literature that a rotator cuff tear can be sequela to impingement syndrome, the same article likewise indicates that rotator cuff tears should be within the differential diagnosis for impingement syndrome. (Ex. 15, p. 5.) Additionally, the impingement syndrome article discusses the type II or "class II" acromion, which was documented on petitioner's x-rays (ECF No. 22-1, p. 13), as an anatomical variant that may predispose individuals to impingement syndrome. (Ex. 15, p. 2.) Thus, given that Dr. Leong suggested on petitioner's disability form that petitioner's rotator cuff tear dated back to 2020 but indicated on petitioner's questionnaire for this case that her 2020 and 2023 presentations were not one continuous injury (Ex. 16), it is ambiguous how this literature actually relates to Dr. Leong's opinion.

To be clear, all of the above indicates that, on the current record, petitioner has not met her burden of proof with respect to any shoulder injury caused-in-fact by vaccination. However, special masters are required to ensure the parties have had a full and fair opportunity to develop the record. Accordingly, I will provide petitioner an opportunity to seek out an expert report to support a cause-in-fact claim.

## V.    Conclusion

Considering the record as a whole under the standards applicable in this program, petitioner has not preponderantly established that her October 10, 2020 flu vaccination resulted in a Table SIRVA. Therefore, her Table claim is DISMISSED. However, petitioner has preponderantly demonstrated that her alleged injury persisted for at least six months and it would be premature at this juncture to also dismiss her alternative cause-in-fact claim. A separate scheduling order will be issued with respect to how this case will proceed.

**IT IS SO ORDERED.**

**s/Daniel T. Horner**
Daniel T. Horner
Special Master